## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

ROGER DAVID ALCOTT,

    Plaintiff,

v.             Case No. 3:21-cv-308-TJC-MCR

CORIZON, LLC, et al.,

    Defendants.

_____

## <u>ORDER</u>

### I. Status

Plaintiff is proceeding on a Second Amended Complaint (Doc. 85) against Corizon,[1] Dr. Benjamin Hasty, and Advanced Eye Care.[2] At the time the Second Amended Complaint was filed, Plaintiff was represented by counsel. He is now proceeding pro se.

Before the Court is Defendants Dr. Benjamin Hasty and Advanced Eye Care of Bay County's Motion for Final Summary Judgment (Doc. 148; Motion) with exhibits (Docs. 147, 149). Plaintiff filed a Response (Doc. 152; Response),

---

[1] This case is currently stayed as to the claims against Corizon due to Corizon's suggestion of bankruptcy. <u>See</u> Order (Doc. 110).

[2] Plaintiff also sued Centurion, but Plaintiff and Centurion resolved those claims through settlement. <u>See</u> Order (Doc. 144).

and Defendants filed a Reply (Doc. 153; Reply). With the Court's leave, Plaintiff filed a Sur-Reply (Doc. 157; Sur-Reply). The Motion is ripe for review.

## II.    Plaintiff's Second Amended Complaint[3]

According to Plaintiff, he was incarcerated in the Florida Department of Corrections (FDC) from April 1, 2014, to November 27, 2019. Doc. 85 at 2. On March 31, 2015, he "was diagnosed with cataracts in each eye," and on May 16, 2017, a medical notice indicates that "cataract surgery was recommended 'as soon as possible.'" Id. at 6. Plaintiff asserts that "it is well-known that cataracts develop faster in younger patients (less than 60-years old) and in patients that may have certain medical condition[s] such as HIV. A 38-year-old patient, like [Plaintiff] with an HIV diagnosis, should have had follow up visits at least every six (6) months after the initial diagnosis." Id. at 6-7. On January 12, 2018, Plaintiff had a consultation with Dr. Hasty. Id. at 8. Dr. Hasty recommended that Plaintiff undergo complex cataract surgery on his left eye to be followed by surgery on his right eye 1-2 months later. Id. at 9. He further noted the high risk of retinal detachment after surgery. Id. at 8-9.

On April 18, 2018, Dr. Hasty performed surgery on Plaintiff's left eye. Id. at 9. The next day, during a scheduled follow-up appointment, Plaintiff was not

---

[3] Because this case is before the Court on Defendants Dr. Hasty and Advanced Eye Care's Motion, the Court focuses its summary of Plaintiff's allegations on these Defendants only.

experiencing any complications. Id. On May 16, 2018, Dr. Hasty performed surgery on Plaintiff's right eye. Id. Plaintiff contends that "[n]ursing records from May 24, 2018 indicate that on May 18, 2018, [Plaintiff] noted blacklines and decreased left eye vision," and that on the following day, Plaintiff advised that "'he could not see out of the left eye at all.'" Id. On May 24, 2018, "Dr. Hasty was called . . . when [Plaintiff] could not see out of his left eye . . . and was seeing floaters out of his right eye." Id. Without examining Plaintiff, Dr. Hasty "prescribed drops instead of performing a prompt ophthalmic evaluation." Id. at 10. On May 29, 2018, Plaintiff "was next seen for a pre-scheduled post-operative clinical follow up" with Dr. Roberts. Id. Dr. Roberts immediately transferred Plaintiff to First Coast Retina Center "in a final effort to save [his] vision." Id. However, the delays in Plaintiff receiving care ultimately resulted in him going blind. Id.

Based on the above allegations, Plaintiff raises the following claims against Defendants Hasty and Advanced Eye Care: (1) "medical negligence"[4]

---

[4] Plaintiff's claims stem from the rendering of and/or the failure to render medical services and rely on the application of medical skill and judgment in deciding how to best handle Plaintiff's medical care relating to his eyesight. Thus, the claims are medical malpractice claims under Florida law rather than ordinary negligence claims. See Vance v. Okaloosa-Walton Urology, P.A., 228 So. 3d 1199, 1200 (Fla. 1st DCA 2017) ("When evaluating whether a complaint sounds in ordinary or medical negligence, courts must determine from the allegations whether the claim arises out of the rendering of, or the failure to render, medical care or services. The core inquiry is whether the claim relies on the application of the medical malpractice standard of care." (internal quotations and citations omitted)); see also Whittaker v. Sanchez, No. 19-13486, 2021 WL 4495808, at *3 (11th Cir. Oct. 1, 2021) ("The plaintiff's labels are

leading to loss of sight in Plaintiff's left and right eyes against Dr. Hasty (Count X (left eye); Count XI (right eye)); and (2) vicarious liability against Advanced Eye Care (Count XII).[5] As relief, Plaintiff seeks compensatory damages and all other just and proper relief.

### III.    Standard of Review

"A district court must grant summary judgment 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" <u>Atheists of Fla., Inc. v. City of Lakeland</u>, 713 F.3d 577, 589 (11th Cir. 2013) (quoting Fed. R. Civ. P. 56(a)). In making this assessment, the court "view[s] all facts and reasonable inferences drawn therefrom in the light most favorable to [] the non-moving party." <u>Id.</u> (cleaned up). Conclusory allegations are insufficient to create a triable issue of fact. <u>Carter v. City of Melbourne</u>, 731 F.3d 1161, 1167 (11th Cir. 2013) (citation omitted). "Issues of fact are 'genuine' only if a reasonable jury, considering the

---

not dispositive as to whether a claim sounds in medical malpractice; the district court must decide if the allegations in the complaint rely on the application of the medical malpractice standard of care."); <u>Parker v. United States</u>, No. 5:22-cv-679-WFJ-PRL, 2024 WL 4008113, at *3 (M.D. Fla. Aug. 30, 2024) ("Florida Statutes define a medical malpractice claim as a claim, arising out of the rendering of, or the failure to render, medical care or services. An action constitutes medical care or services when it require[s] the use of professional judgment or skill." (internal quotations and citations omitted)).

[5] The Court previously granted Defendant Hasty's request to dismiss Plaintiff's Eighth Amendment deliberate indifference claim against him (Count XIII). <u>See</u> Order (Doc. 119).

evidence presented, could find for the nonmoving party." <u>Atheists of Fla.</u>, 713 F.3d at 589 (citing <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249 (1986)).

## IV.  Record Evidence

On January 12, 2018, Dr. Hasty examined Plaintiff and recommended that he undergo complex cataract surgery on his left eye "soon," to be followed by cataract surgery on his right eye 1-2 months later. Doc. 147-1 at 212; <u>see</u> Doc. 147-2 at 1. On April 18, 2018, Dr. Hasty performed complex cataract surgery on Plaintiff's left eye. Doc. 147-2 at 7; Doc. 147-3 at 12. Dr. Hasty noted that Plaintiff's case was "complicated . . . mainly because of the density of the lens requiring Trypan Blue." Doc. 147-3 at 12. He further indicated that Plaintiff was at high risk of retinal detachment. Doc. 147-2 at 7. The next day, Dr. Hasty saw Plaintiff for a follow-up appointment, and noted that Plaintiff was "doing OK" and he recommended that Plaintiff use the standard GTTs (drops) and follow-up with Dr. Roberts in one week. Doc. 152-1 at 1; <u>see</u> Doc. 147-2 at 7. Dr. Hasty further recommended that Plaintiff undergo cataract surgery on the right eye in 1-2 months. Doc. 152-1 at 1.

On May 16, 2018, Dr. Hasty performed complex cataract surgery on Plaintiff's right eye. Doc. 147-3 at 1. Dr. Hasty noted: "Patient went to the recovery room free of complications, but is at high risk for retinal detachment because of the very long, 29 mm axial length in both eyes." <u>Id.</u>; <u>see</u> Doc. 147-2 at 14 (Dr. Hasty's post-operative notes indicating Plaintiff was at high risk for

retinal detachment). The next day, May 17, 2018, Dr. Hasty saw Plaintiff for a follow-up appointment. Doc. 147-2 at 14. He recommended that Plaintiff use the eye drops as ordered and see Dr. Roberts in the optometry clinic in one week. Doc. 157-2 at 2-3.

On May 21, 2018, Plaintiff authored a sick-call request, that was received and marked as "Routine" on May 22, 2018. Doc. 147-4 at 1. Plaintiff stated that his eyes were hurting, he just had surgery and he was seeing traces going back and forth, and his vision was blurry. Id. He also complained about corns on his feet and asked for them to be removed. Id. On May 24, 2018, Plaintiff was examined by a nurse. Doc. 147-2 at 15. The nurse wrote that Plaintiff reported "seeing black lines and blurry vision in [his] left eye" beginning on May 18, 2018, and by the next day, he "could not see out of [his] left eye at all." Id. The nurse further wrote that Plaintiff reported seeing well out of his left eye prior to the surgery on his right eye on May 16, 2018, and that he had clear vision in his right eye since the surgery on May 16, 2018. Id. The nurse immediately referred Plaintiff to urgent care. Id.

Later that same day, Dr. Dure examined Plaintiff. Id. at 16. Dr. Dure's notes reflect that the "[c]ase was discussed with Dr. Hasty regarding patient left eye visual disturbances." Id. According to Dr. Dure, Dr. Hasty recommended two types of eye drops until Plaintiff was seen by an optometrist. Id. Dr. Dure noted that Plaintiff was scheduled to be seen on May 29, 2018. Id. He assessed

Plaintiff with "left eye visual disturbances" and noted that the "case was also discussed with Dr. Bassa," the Chief Health Officer at the Reception and Medical Center (RMC). Id.

Plaintiff was seen by Dr. Roberts on May 29, 2018, who recommended an emergent referral to Dr. Rappaport. Id. Dr. Roberts diagnosed Plaintiff with left eye retinal detachment. Doc. 157-2 at 8-9. Dr. Bassa indicated on May 29, 2018, that Plaintiff had "left eye retinal detachment" and he was referred emergently to a retinal specialist. Doc. 147-2 at 17.

Dr. Hasty submitted a Declaration (Doc. 147-1) summarizing his care and treatment of Plaintiff. In relevant part, he avers:

> At all times material, I was engaged as a consulting ophthalmologist for National Eye Care, the entity contracted by Centurion of Florida, LLC to provide eye care and surgery to the inmates housed within the [FDC].
>
> I entered into a contract with National Eye Care, which expressly referenced Centurion's contract with National Eye Care, which expressly referenced Centurion's contract with the [FDC].[6] Pursuant to these agreements, I worked as a subcontractor to Centurion, providing specialty and surgical treatment to inmate-patients for the [FDC]. At all times material, I was acting within the scope of, and pursuant to, guidelines established by FDC rule and/or these contracts.
>
> To perform the contracted medical services, I traveled to the [FDC RMC], which is located

---

[6] The contracts are attached to Dr. Hasty's Declaration. See Doc. 147-1 at 8-210.

approximately 250 miles from where I reside. I went to RMC two days each month. One day per month I performed surgeries. On the following day, I held clinic. During my clinic day at RMC, I conducted the day-one postoperative follow-up evaluation for the inmate-patients on whom I had performed surgery the previous day and medical evaluations to other inmates.

At all times material, National Eye Care and Centurion retained numerous full-time optometrists who worked in the various [FDC] prison facilities to provide eye care to the inmates. Optometrists are trained to perform postoperative patient eye care and management. After I performed surgery and conducted the day-one postoperative evaluation, the prison optometrists performed all of the remaining postoperative follow-up care, either at RMC or at the facility where the inmate was housed. I was never involved in any postoperative care after the day-one postoperative evaluation (and it was not my responsibility to be involved) unless one of the treating optometrists recommended that the patient be sent back to me for further consultation and the facility placed the patient back on my list of patients to be seen during the two days I was at RMC each month. There are many inmate-patients that I never saw again after their day-one postoperative evaluation.

I was only retained to perform surgical interventions and specialty consultations for Centurion as referred by the prison optometrists. I relied on the prison optometrists to conduct all necessary postoperative examinations and to provide reasonable postoperative care. It is well within the standard of care and industry practice for optometrists to provide postoperative care after an ophthalmologist performs surgery on a patient and conducts the day one (1) post op evaluation.

After the day-one postoperative evaluation, I did not have access to the patient's chart (the chart is paper and accompanies the inmate back to his housing facility). I did not have the ability to arrange for a patient to be transferred by FDC to be seen by myself or any other specialist. While I sometimes completed forms recommending that an inmate-patient be seen by a specialist or return to me for follow-up, it was always subject to Centurion and/or FDC's approval, scheduling and arrangement for transport.

I communicated with the prison optometrists through my notes, and left instructions for postoperative follow-up. My notes were contained on the same medical form that the prison optometrists used to chart their postoperative follow-up care. It was my understanding and expectation that prison optometry staff reviewed and followed my instructions.

For my two days each month at RMC, my surgical and clinic schedules were provided by Centurion staff to me a few days beforehand. They determined which inmate-patients I would see at RMC on which date. I had no involvement in arranging patient transfer between facilities or to outside providers.

Mr. Alcott was referred to me by prison optometry staff for a consultation and cataract surgery. I first saw Mr. Alcott on January 12, 2018. Based on my review of the chart and interaction with the inmate-patient, it was clear that Mr. Alcott had severe cataracts that had worsened since 2015 and which were significantly impacting his vision. At this visit, even with his glasses he could only count fingers. I noted that he had a history [of] amblyopia (lazy eye), as well as HIV and schizophrenia. After a thorough examination, I diagnosed him with dense cataracts in both eyes (worse in the left eye) and high axial myopia (extreme nearsightedness) with high retinal

9

detachment risk. My plan was to perform complex cataract surgery on his left eye, with cataract surgery on the right eye 1-2 months later.

I performed complex cataract surgery on Mr. Alcott's left eye on April 18, 2018. The surgery went well but was complicated by the density and bulkiness of the cataract as well as his very long axial length. I conducted a post-surgical follow-up exam on April 19, 2018. At that time, Mr. Alcott was doing well. I prescribed standard GTTs (drops) and ordered that he be rechecked in 1 week with Dr. Roberts, the prison optometrist assigned to his post-surgical follow-up care.

I performed complex cataract surgery on the right eye on May 16, 2018. The surgery was free of complications, but I still noted that he was at high risk for retinal detachment because of the very long 29mm axial length in both eyes. I followed up with Mr. Alcott on May 17, 2018, and again ordered standard GTTs and follow up in the optometry clinic in 1 week. At this time, the right eye looked fine and the patient did not voice any complaints to me about the left or right eye. At this point, I turned the patient's care over to the prison optometry staff.

I have subsequently learned that on May 21, 2018, Mr. Alcott submitted a sick call request about eye pain, and that he was seen by a prison physician on May 24, 2018, who is alleged to have called me about the patient. I have no recollection of a call with a prison physician on this date.

I had no further involvement in Mr. Alcott's medical care.

Doc. 147-1 at 2-6 (internal record citations and paragraph enumeration omitted).

Defendants also submitted the Report of Expert Witness, John A. Beneke, M.D., a board-certified ophthalmologist. Doc. 147-6. Dr. Beneke reviewed Plaintiff's medical records, the FDC's Health Services Bulletin 15.03.13, and the pre-suit affidavits from Chris Channon, MD, FACS and Sharon Aronovitch, Ph.D., RN, CWOCN. Id. at 2. Dr. Beneke avers in pertinent part as follows:

> Based on my review of the records, as well as my professional education, my experience, and training I am of the opinion that the Centurion healthcare providers, acted within the standard of care owed to Roger Alcott as summarized in the sequence of events and generalized facts as set forth below.

> On January 12, 2018, Mr. Alcott had his first ophthalmology consult with Dr. Ben Hasty, M.D. Dr. Hasty recommended cataract surgery and noted that there was a high risk of retinal detachment after surgery. Dr. Hasty planned the left eye complex cataract surgery to be followed by the right eye cataract surgery one to two months later. Mr. Alcott had a history of decreased visual acuity in the right eye for the prior two years, which was getting progressively worse. The diagnosis included a dense cataract left eye greater than right eye and high axial myopia with retinal detachment risk. The plan was to perform left eye cataract surgery soon and follow with the right eye surgery one to two months thereafter.

> In fact, the surgery to the left eye was completed on April 18, 2018. The cataract surgery was successful, and Mr. Alcott showed markedly improved vision on his first postoperative visit which was on April 19, 2018.

> Accordingly, the right eye surgery was then completed on May 16, 2018. The right eye surgery likewise appeared to be successful, and Mr. Alcott

showed improved vision in the right eye on his post-operative visit on the following day.

Unfortunately, two days after the surgery to the right eye, Mr. Alcott started having symptoms in his left eye. When Mr. Alcott reported his symptoms to the nurse in urgent care following his sick call request, the nurse recognized Mr. Alcott's symptoms and Dr. Hasty was consulted. Dr. Hasty ordered Mr. Alcott to be placed on an anti-inflammatory regimen consisting of steroid drops and non-steroid drops and he was to be worked in and evaluated by the optometrist[,] Dr. Roberts, on her next visit which was on the 29th.

Dr. Roberts examined Mr. Alcott on May 29, 2018, and immediately referred Mr. Alcott to Dr. Rappaport, the retinal specialist in Jacksonville, who examined him that very day.

On May 29, 2018, Dr. Rappaport diagnosed Mr. Alcott with a serous retinal detachment in his left eye and treated him with a sub-tenon's injection, along with a regimen of topical steroid drops. No discernable tears or rhegmatogenous detachment was noted.[7]

Mr. Alcott followed up with Dr. Rappaport on June 5, 2018, and Mr. Alcott was not getting any better at that time, so Dr. Rappaport gave him another sub-tenon's injection, increased his topical steroid use and added oral steroids. Mr. Alcott was to follow-up in two weeks.

On June 21, 2018, Dr. Rappaport saw Mr. Alcott again and noted that his condition was not improving and that he was not responding to his treatment regimen. Hence, Dr. Rappaport requested a second opinion at a training ophthalmology center at Shands Hospital in Gainesville. Mr. Alcott was then sent to the University of Florida at Shands Medical Center in

---

[7] Defendants submitted Dr. Rappaport's treatment notes. See Doc. 147-5.

> Gainesville. During this time, the vision in Mr. Alcott's
> right eye deteriorated as well. Mr. Alcott received
> further treatment at Shands for both his left and right
> eyes, including sub-tenon's injections and topical
> medications with no improvement
>
> At the University of Florida Medical Center at
> Shands Hospital, Mr. Alcott underwent a vitrectomy
> on August 13, 2018, to his right eye. Unfortunately, on
> his postoperative visit on August 30, 2018, he was
> noted to have a retinal detachment to his right eye. He
> underwent subsequent retina surgery on October 10,
> 2018, which did not result in any improvement in his
> vision.
>
> In my opinion, Mr. Alcott was provided
> appropriate care, but he suffered complications due to
> his high myopia and possibly due to his long-standing
> HIV status.
>
> Based on my review as well as my education[,]
> training, and experience, I conclude with a reasonable
> degree of medical certainty that the Standard of Care
> was met and that no act or omission on the part of the
> Centurion health care providers, caused Roger Alcott's
> injuries.

Id. at 3-6.

Finally, Plaintiff submitted the Affidavit of Chris Channon, MD, FACS,

who Plaintiff consulted during his pre-suit investigation. See Doc. 152-1 at 10-

11. Dr. Channon has "been actively engaged in the practice of ophthalmology

within the five-year period immediately prior to the incident giving rise to this

claim" and he is "familiar with the standard of care as it pertains to the

management in situations such as those that unfolded in this case." Id. at 10.

Dr. Channon "reviewed the medical records for [Plaintiff] as provided by the [FDC]," and based upon review of those records, he opines:

> [W]ithin a reasonable degree of medical probability, reasonable grounds exist to initiate a medical negligence claim against Benjamin Hasty, MD. . . . This is based on the [FDC] Chronological Record of Health Care dated 5/24/2018. The history recorded states that on 05/18/2018 the inmate saw blacklines in [sic] decreased vision in the left eye. On 05/19/2018 the inmate reported "could not see out of the left eye at all[.]" The nurse clearly identified that the loss of vision represented a medical emergency and initiated a prompt medical evaluation with Dr. Dure. Consultation with Dr. Hasty was made. <u>Dr. Hasty, without the benefit of examination, and knowing the high risk of retinal detachment in this patient, prescribed drops instead of prompt ophthalmic evaluation. More likely than not, prompt examination would have revealed the nature of the condition.</u> Instead, clinic follow up 05/29/2018 (five days later, with Dr. Roberts, OD) was arranged. <u>This failure to examine the inmate delayed accurate diagnosis of the cause of loss of vision and resulted in further delay in initiating referral to the appropriate ophthalmologist for treatment. This more likely than not diminished the chances of sight restoration in the inmate's left eye.</u>

Doc. 152-1 at 10-11 (emphasis added).

## V.    Analysis[8]

According to Defendants, Plaintiff fails to establish a medical malpractice claim because he "has not produced any competent evidence establishing that

---

[8] To the extent Defendants claim sovereign immunity, the record is not dispositive on this issue. Because the Court finds that Defendants are entitled to summary judgment

any alleged breach caused his injuries." Motion at 16. They argue that while "Plaintiff makes the conclusory assertion that Dr. Hasty was aware of his condition as of May 24, 2018," Plaintiff fails to produce "any record evidence establishing <u>what information was told to Dr. Hasty</u> about [Plaintiff's] condition on this date." <u>Id.</u> Because there is no evidence to establish what information was told to Dr. Hasty, according to Defendants, "Plaintiff, and any expert retained by Plaintiff, can only make unsubstantiated assumptions about the sufficiency of Dr. Hasty's purported response." <u>Id.</u> Additionally, Defendants contend that because Dr. Hasty was only at RMC on two days each month, "there is no record evidence establishing how or when Dr. Hasty could or should have arranged for 'prompt ophthalmic evaluation.'" <u>Id.</u> at 17. Indeed, Dr. Hasty contends that the only action he could have taken was to "make a recommendation, subject to the approval of Centurion and/or FDC." <u>Id.</u> Defendants also note that when Plaintiff was evaluated on May 29, 2018, the clinicians "essentially continued the existing course of treatment (steroidal drops) with follow-up a week later." <u>Id.</u>

Defendants further argue that "Plaintiff cannot prove the essential element of causation." <u>Id.</u> According to Defendants, "Plaintiff's theory of causation is that the purported delay in referral to ophthalmology between May

---

based on their substantive arguments, the Court declines to address in detail Defendants' sovereign immunity argument.

24 and May 29 delayed his diagnosis and decreased the chance of sight restoration in both the left and right eyes by an unknown degree." Id. at 19. Defendants acknowledge that "Plaintiff has only asserted a possibility of causal connection, not a probability that the breach proximately caused the injury at issue—permanent loss of vision in both eyes." Id. As to Plaintiff's left eye, Defendants contend that "there is no evidence in the record from which a reasonable juror could conclude that Dr. Hasty's negligence was the but-for cause of injury." Id. at 20; see Reply at 4. And as to the right eye, Defendants assert that "Plaintiff did not lose vision in the right eye until weeks later, when he was being followed by vitreoretinal specialists;" and "[t]here is no competent evidence explaining how the purported delay caused a decreased chance of sight restoration in the right eye, which was not an issue on May 24, 2018." Motion at 20.

Plaintiff contends that Dr. Hasty "breached the standard of care by abrogating his responsibility as the surgeon to oversee [his] post-operative care," "by failing to perform an examination of [his] left eye at [his] post-operative visit on May 17, 2018," and "by failing to review [his] medical records before recommending any treatment options on May 24, 2018." Response at 7. Plaintiff further argues that Dr. Hasty breached the standard of care by "failing to order an immediate eye examination on May 24, 2018." Sur-Reply at 9. Plaintiff contends that when Dr. Hasty conducted his follow-up on May 17,

2018, the day after the surgery on his right eye, Dr. Hasty should have examined his left eye as well, because Dr. Hasty knew of the severe complications of which Plaintiff was at risk and Plaintiff told Dr. Hasty about the issues he was experiencing with his left eye.[9] Response at 7; see Sur-Reply at 3-4. Plaintiff argues that "[i]t is unfathomable how an experienced ophthalmologist would not have ordered an immediate examination of [Plaintiff's] eyes when complications developed with both eyes in the eight days after surgery – especially when [Dr. Hasty's] original order was for an eye professional to examine [Plaintiff] one week after the May 17, 2018 surgery." Sur-Reply at 5-6. Plaintiff concludes that "[p]roper post-operative care by Dr. Hasty would have likely saved [his] sight in both eyes." Id. at 8. To support his position, Plaintiff includes some of his medical records, the Affidavit of Dr. Channon, and an article regarding "An Ophthalmologist's Duties Concerning Postoperative Care" from the American Academy of Ophthalmology.[10] See Docs. 152-1, 157-1, 157-2.

---

[9] Throughout his unverified Response and Sur-Reply, Plaintiff indicates that he told Dr. Hasty he was experiencing issues with his left eye immediately prior to Dr. Hasty performing surgery on his right eye on May 16, 2018, and/or during his follow-up appointment on May 17, 2018.

[10] The article states that it is the position of the American Academy of Ophthalmology "that an operating ophthalmologist's duties to a patient regarding postoperative medical care are satisfied if the ophthalmologist" either personally performs the postoperative care throughout the patient's "at-risk" period or arranges for the patient's postoperative care to be completed by a qualified and licensed practitioner with the patient's consent. Doc. 157-1 at 1.

"To prevail in a medical malpractice case a plaintiff must establish the following: the standard of care owed by the defendant, the defendant's breach of the standard of care, and that said breach proximately caused the damages claimed." Gooding v. Univ. Hosp. Bldg., Inc., 445 So. 2d 1015, 1018 (Fla. 1984). "The standard of professional care is a level of care, skill, and treatment that, in consideration of all surrounding circumstances, is recognized as acceptable and appropriate by similar and reasonably prudent health care providers." Saunders v. Dickens, 151 So. 3d 434, 441 (Fla. 2014) (citing Fla. Stat. § 766.102) ("[T]he burden is on the plaintiff to establish that the care provided by the physician was not that of a reasonably prudent physician."). "As to the element of causation, 'Florida courts follow the more likely than not standard of causation and require proof that the negligence probably caused the plaintiff's injury.'" Cantore v. W. Boca Med. Ctr., Inc., 254 So. 3d 256, 260 (Fla. 2018) (quoting Gooding, 445 So. 2d at 1018). "In other words, the plaintiff must show that there is a 51% or more likelihood that the defendant's negligence caused the plaintiff's injuries." Wroy v. N. Miami Med. Ctr., Ltd., 937 So. 2d 1116, 1117 (Fla. 3d DCA 2006).

### a. Count X

In Count X of the Second Amended Complaint, Plaintiff claims that "[a]s a direct and proximate result of Dr. Hasty's negligence, [Plaintiff] lost the sight in his left eye, endured unnecessary pain [and] suffering[, and] his quality of

life has been adversely affected forever." Doc. 85 at 37. As detailed above, Defendants present evidence, in the form of medical records and Declarations from Dr. Hasty and Dr. Beneke, to show that Dr. Hasty did not breach the standard of care. Defendants have carried their initial burden of showing there are no genuine issues of material fact with respect to Count X. Thus, the burden on summary judgment shifts to Plaintiff, who must go beyond the pleadings and "designate specific facts showing that there is a genuine issue for trial." Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 594 (11th Cir. 1995) (internal citations and quotation marks omitted). As explained below, the Court finds that Plaintiff has not done so.

In opposition to Defendants' Motion, the only expert testimony that Plaintiff submitted was the affidavit of Dr. Channon, Plaintiff's pre-suit expert. Dr. Channon's affidavit neither addresses the standard of care for someone in Plaintiff's position nor discusses Plaintiff's diagnosis, standard treatment, or whether his sight could have been restored in the left eye.[11] Instead, based solely on the nurse's May 24, 2018 medical record, Dr. Channon notes that "Dr. Hasty, without the benefit of examination, and knowing the high risk of retinal

---

[11] While Plaintiff argues in his Response and Sur-Reply about various ways Dr. Hasty allegedly breached his duty to Plaintiff, Plaintiff's unverified, lay opinions are insufficient. See Guzman v. Lazzari, 394 So.3d 106, 110 (Fla. 4th DCA 2024) ("Only experts are allowed to testify regarding a medical provider's applicable standard of care." (citing Fla. Stat. § 766.102(5))).

detachment in this patient, prescribed drops instead of prompt ophthalmic evaluation." And then Dr. Channon concludes: "More likely than not, prompt examination would have revealed the nature of the condition. . . . This failure to examine the inmate delayed accurate diagnosis of the cause of loss of vision and resulted in further delay in initiating referral to the appropriate ophthalmologist for treatment. This <u>more likely than not diminished the chances of sight restoration</u> in the inmate's left eye."

It is unclear whether Dr. Channon was aware that Dr. Hasty was not physically present at the prison on May 24, 2018, and thus, he could not have personally examined Plaintiff. Regardless, Dr. Channon does not explain or support his conclusion. Notably, the medical records reflect that when Dr. Dure called Dr. Hasty on May 24, 2018, Plaintiff had reported that starting on May 19, 2018, he could no longer see out of his left eye,[12] and upon the nurse's examination on May 24, 2018, Plaintiff reported that the vision in his left eye was "completely gone" and he could not see light through the left eye. Doc. 147-2 at 15. Thus, by the time Dr. Hasty was called, Plaintiff was already reporting being unable to see out of his left eye. Dr. Channon does not opine that Dr.

_____

[12] This is somewhat contradictory to Plaintiff's notations in his sick-call request dated May 21, 2018, in which Plaintiff stated that his eyes were hurting, he was seeing traces going back and forth, and his vision was blurry. Doc. 147-4 at 1. Nevertheless, there is no dispute that Plaintiff reported being unable to see out of his left eye on May 24, 2018.

Hasty's alleged negligence more likely than not caused Plaintiff's initial blindness. And Plaintiff presents no expert testimony about the standard of care or how Dr. Hasty breached that standard. Nor does Plaintiff present evidence regarding whether his sight in his left eye could have been restored had he been examined by an optometrist or ophthalmologist between May 24 and May 29, 2018. Dr. Channon's unexplained and speculative conclusion that Dr. Hasty's failure to refer Plaintiff for "prompt ophthalmic evaluation" "more likely than not diminished the chances of sight restoration" does not show that Dr. Hasty's actions or inactions probably caused Plaintiff's blindness. See Gooding, 445 So.2d at 1020; see Wroy, 937 So. 2d at 1117, 1118.

While the Court is sympathetic to Plaintiff's position, Plaintiff simply has not carried his burden in responding to Defendants' Motion. Dr. Channon's affidavit—the only expert testimony Plaintiff submitted—neither establishes the standard of care nor that Dr. Hasty's alleged actions or inactions more likely than not caused Plaintiff's blindness in his left eye. Thus, Dr. Hasty is entitled to summary judgment on Count X.

### b. Count XI

As to Plaintiff's right eye, Defendants have shown, by reference to the medical records and the Declarations of Dr. Hasty and Dr. Beneke, that Dr. Hasty did not breach the standard of care and no genuine issue of material fact exists. Indeed, the medical records indicate that on May 24, 2018, Dr. Dure

consulted with Dr. Hasty about the visual disturbances in Plaintiff's left eye. See Doc. 147-2 at 15-16. Further on May 29, 2018, Dr. Roberts diagnosed Plaintiff with retinal detachment in his left eye and noted that Plaintiff's visual acuity in his right eye was 20/30. Doc. 147-2 at 17; Doc. 157-2 at 8-10. The parties do not dispute that after May 24, 2018, Dr. Hasty was not involved in Plaintiff's medical care. The only expert testimony Plaintiff submitted does not address any issues with respect to Plaintiff's right eye. See Doc. 152-1 at 11 (averring that Dr. Hasty's alleged negligence "more likely than not diminished the chances of sight restoration in [Plaintiff's] left eye" (emphasis added)). Plaintiff has presented no evidence to create an issue of fact as to his right eye. Thus, Dr. Hasty is entitled to summary judgment in his favor on Count XI.

### c. Count XII

Finally, Defendant Advanced Eye Care is also entitled to summary judgment on the vicarious liability count. Because Plaintiff failed to prove his medical malpractice claims against Dr. Hasty, the vicarious liability count against Advanced Eye Care automatically fails. This is so "because an alleged vicariously liable employer and its employee are in no sense joint tort-feasors, [and thus,] a party must establish an employee's liability in a vicarious liability action against the employer. If a party fails to do so, thus exonerating the employee, a principal cannot be held liable either." Tsuji v. Fleet, 366 So. 3d 1020, 1032 (Fla. 2023) (internal quotations and citations omitted); see also Goss

<u>v. Hum. Servs. Assocs., Inc.</u>, 79 So. 3d 127, 131 (Fla. 5th DCA 2012) ("Vicarious liability is not based on the negligence of the employer, but rather the negligence of the employee imputed to the employer."). Thus, Advanced Eye Care is entitled to entry of summary judgment in its favor on Count XII.

Accordingly, it is

**ORDERED**:

1.      Defendants Dr. Benjamin Hasty and Advanced Eye Care of Bay County's Motion for Final Summary Judgment (Doc. 148) is **GRANTED**. The Court will withhold entry of judgment until the case concludes. <u>See</u> Fed. R. Civ. P. 54.

2.      **By March 31, 2025, and every 120 days thereafter**, Defendant Corizon shall file a notice updating the Court on the status of Corizon's bankruptcy proceedings. Also, immediately upon any action by the bankruptcy court that may affect the stay in this case, Defendant Corizon shall file a notice so alerting the Court.

3.      Pending further Order, the **Clerk** shall **administratively close** this case.

**DONE AND ORDERED** at Jacksonville, Florida, this 29th day of January, 2025.



TIMOTHY J. CORRIGAN
Senior United States District Judge

JAX-3 1/21
c:
Counsel of Record

Roger David Alcott
1011 Jamaica Avenue
Fort Pierce, FL 34982
(772) 708-3186